**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| THE CAPITAL MARKETS COMPANY, LLC, | . |
| Plaintiff, | Case No._____ |
| vs. | **COMPLAINT** |
| ISAAC HALPERN, | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff The Capital Markets Company, LLC ("Capco" or the "Company"), by and through its undersigned counsel, for its Complaint against Isaac Halpern ("Defendant"), hereby alleges as follows:

## NATURE OF THE CLAIMS

1.      Plaintiff Capco brings this emergent action against its former employee Head of Strategy and executive leadership team member, Isaac Halpern, to protect its confidential information and customer good will and to prevent irreparable harm that would be caused by Halpern's breach of his non-competition, non-solicitation/dealing, and confidentiality obligations. Specifically, Halpern has advised that he plans to commence employment on or before September 19, 2022 with Capco's direct competitor, Ernst & Young Parthenon ("EYP"), which is Ernst & Young's specialized management consulting arm.

2.      Over the course of eight (8) years, Capco provided Halpern with the support, exposure, training, and professional opportunity to grow from a manager level consultant to a Partner and, ultimately, Capco's Head of Strategy and a member of Capco's executive leadership team.

3.     As the Head of Strategy, Mr. Halpern led a team of 60-plus professionals who are responsible for bringing in an anticipated amount of over approximately $20,000,000 in annual revenue for Capco for Fiscal Year 2023. But the Strategy Practice's reach and importance to Capco is far greater than that because, as explained below, it plays a lead role in developing Capco's overall strategy and, further, often serves as an entry point for creating or expanding client relationships which, in turn, enhances business opportunities for other Capco groups.

4.     Halpern was intimately involved with Capco's business operations, business development plans, and general strategy.  He participated in Partner meetings and Capco general strategy sessions to lead and grow the business.  Indeed, Halpern provided the same type of Strategy work he did for clients to Capco itself.  He worked closely with the head of Capco US in creating the strategic vision for the business.

5.     By virtue of Halpern's special and unique role at Capco, he had access to, played a role in developing and regularly utilized, some of Capco's most highly sensitive, confidential information relating to each of Capco's business lines.  Such information included, but was not limited to, confidential information relating to Capco's plans for retaining and deepening relationships with existing clients; opportunities for attracting prospective new clients; plans for managing the business's competitive landscape, including specifically with respect to competitors like EYP; marketing, budget and pricing strategies; plans relating to expansion; insight relating to client satisfaction, dissatisfaction, and preferences; as well as highly sensitive information pertaining to his Strategy team and their compensation.

6.     To protect its interests and confidential information, Capco entered into a Business Protection Agreement ("BPA") with Halpern whereby he received significant financial benefits in exchange for agreeing to certain non-competition, non-solicitation/dealing, and non-disclosure

obligations to Capco. With regard to competition, Halpern agreed that for one (1) year following the termination of his employment with Capco, he would not "in any Capacity be involved with any business concern situated within the Territory . . . which is, will be, or is planning to be in competition with any Restricted Business[.]" "Restricted Business" is any Capco business with which Halpern was materially involved in the twelve months prior to his last day of employment, and "Territory" is "the US, as well as any additional territories for which [Halpern] was given responsibility during the course of [his] Employment."

7.     On July 21, 2022, Halpern advised Capco that he was resigning.  He would not reveal the name of the company with which he had accepted employment, but he confirmed that he was going to work for a Company that Capco would consider a competitor, and that he would be working in his new employer's "strategy sleeve."  In the days that followed, Capco learned that Halpern had accepted employment with Capco's direct competitor, EYP, and would be working with the same types of clients and performing the same type of work he did at Capco.

8.     Despite Capco's repeated warnings to Halpern that going to work for one of Capco's direct competitors in a directly competitive role would violate his post-employment obligations, Halpern has stated through counsel that he intends to commence employment with EYP on or before September 19, 2022. Halpern's actions blatantly violate his post-employment covenants and obligations to Capco.

9.     Capco seeks a temporary restraining order, expedited discovery, and a preliminary injunction to protect its legitimate interests and prevent further irreparable harm.  Unless enjoined, Capco will likely experience (i) loss of its client base and customer goodwill, particularly given Mr. Halpern's unique services as Head of Capco Strategy, and (ii) disclosure of confidential information and trade secrets to a direct competitor.

**THE PARTIES**

10.     Plaintiff The Capital Markets Company, LLC is a Delaware limited liability corporation with its principal place of business in New York.

11.     Upon information and belief, Defendant Isaac Halpern is, and at all relevant times was, a citizen and resident of Virginia.

**JURISDICTION AND VENUE**

12.     This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because this is an action between citizens of different states, and the amount in controversy exceeds $75,000 exclusive of interests and costs.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(3) because Defendant is subject to personal jurisdiction in this forum pursuant to a mandatory forum selection clause contained in the Business Protection Agreement giving rise to this action.

**FACTUAL ALLEGATIONS**

A.     **The Nature of Capco's Business**

14.      Capco is a global management and technology consultancy company that provides consulting, technological, and digital services.  Capco's global teams collaborate with clients across the world to develop tailored solutions that address complex business challenges.  Capco provides these services across industries, but has particular expertise in financial services, technology, and energy.

15.     One of Capco's core offerings is its Strategy Practice.  The Strategy Practice works with clients to develop focused, actionable and effective strategic responses to the most difficult business challenges facing the clients, which, in turn, will help drive sustained revenue growth and enhance overall business operations.  This requires members and particularly the leaders of the Strategy Practice to develop a deep understanding of Capco's clients in order to help the clients to

(a) recognize the challenges to their business and (b) develop plans to expand their product offerings, enter into new markets, or develop new business lines. To make this happen, Capco's Strategy Practice works with clients to consider the needs of end consumers, align the client's offerings with those consumer needs, and provides strategic advice on the most effective way to implement the required changes.

16.    The Strategy Practice is one of Capco's marquee practices and is a major player in the consulting space. Its clients include household names, including Morgan Stanley, Silicon Valley Bank and Guardian Life Insurance.

17.    Capco's US clients generally fall into three categories: (1) financial services institutions, such as banks; (2) companies offering financial service type products, such as Apple and Apple Pay[1]; and (3) financial technology partners (commonly referred to as Fintech).

18.    Capco's Strategy Practice fiercely competes against Ernst & Young, Deloitte, PWC, and KPMG (the "Big Four") and other major consulting firms, for clients and projects. As outlined in the recent FY23 US Services Strategy Refresh document, which Halpern was instrumental in developing as the leader of the Strategy Practice, Capco identifies the core competitors of the Strategy Practice to include, Ernst and Young ("EY") (specifically calling out EY-Parthenon).

19.    Capco's Strategy Practice is critical to its larger enterprise. Performing strategy work is often Capco's entre into forming a broader relationship with clients, which, in turn, leads to work in other areas for Capco. For example, providing payments strategy work for Silicon Valley Bank evolved into providing Silicon Valley Bank with other implementation work to

---

[1] Apple is not a Capco customer, and is referenced here as an illustrative example.

execute the suggestions of the Strategy Practice.  As such, Partners across practices work together

to, among other things, identify ways to best serve, and expand, Capco clients.

**B.**    **Halpern's Employment with Capco**

20.    Halpern joined Capco in 2014 as a Managing Principal.  In this role, Halpern had

broad cross-industry responsibilities.

21.    At the time of his separation, Halpern was earning over $700,000 per year in base

salary and incentive compensation.

22.    Halpern was formally assigned to Capco's Washington, DC office.  However, his

role and client responsibilities as a Managing Principal, and later as an Associate Partner and

Partner, were national in scope (in line with the reach of Capco's Strategy Practice).

23.    Halpern described his responsibilities as a Managing Principal in his LinkedIn

profile as follows:

> Led growth, digital strategy, and organizational design projects for clients in
> Capital Markets, Housing Finance, Wealth, Asset Management, and Retail
> Banking. In addition to project delivery, responsibilities included: developing
> solutions and taking them to market; recruiting and building a high-talent team;
> working with firm leadership to develop and execute Capco's strategy; leading
> complex client service and business development efforts, and; coaching, training,
> and mentoring team members.

**C.**    **Halpern's Promotion to Associate Partner**

24.     Effective July 1, 2018, Capco promoted Halpern to Associate Partner.

25.    Being promoted to Associate Partner at Capco is a significant accomplishment.

Capco's Associate Partners are key leaders of its business.

26.    Capco's Associate Partners and Partners have vast access to Capco's highly

confidential and most sensitive information (including concerning Capco employees, clients and

client prospects, and Capco cost and pricing information), and Capco invests in its Associate

Partners and Partners and uses its goodwill to help them establish and deepen client relationships.

To protect these interests, and others, Capco requries that its Associate Partners and Partners execute what Capco refers to as its Business Protection Agreement ("BPA") as a condition of their promotion.

27.     In exchange for agreeing to the terms of the BPA, Associate Partners and Partners receive significant financial benefits and incentive compensation.  Halpern, for example, had the opportunity to participate in Capco's Long Term Incentive Plan, as well as benefit from highly attractive incentive schemes.  Additionally, their promotion to Associate Partner or Partner is contingent upon execution of the BPA.

**C.      Halpern's Restrictive Covenants with Capco**

28.     Halpern entered into a Business Protection Agreement ("BPA") with Capco effective as of July 1, 2018.  The BPA imposes on Halpern numerous restrictions regarding his conduct during and after his employment with Capco.

29.     The BPA imposes restrictions on Halpern's ability to compete with Capco following the cessation of his employment with the Company.  In Section 6.3.10, Halpern acknowledged and agreed that he would not, directly or indirectly, either alone or jointly with or on behalf of any person, firm company or entity in any Capacity, "for twelve (12) months after Termination, in any Capacity be involved with any business concern situated within the Territory or which provides services to Clients situated within the Territory which is, will be, or is planning to be in competition with any Restricted Business[.]"  The BPA specifies that, for purposes of Halpern's restrictions, Territory is defined as "the US, as well as any additional territories for which you are given responsibility during the course of your Employment."

30.     The BPA also includes addresses the solicitation of Capco's existing clients during the twelve (12) months following Halpern's departure from the Company (the "Restricted Period").  Specifically, in Section 6.3.1, Halpern agreed that he would not either alone or jointly,

with or on behalf of any person, firm, company or entity and in any capacity, during the Restricted Period, solicit or endeavor to entice away from the Company, or any Group Company[2], "the business or custom of any Client with a view to providing services to that Client in competition with any Restricted Business[.]"

31.     The BPA similarly prohibits Halpern from soliciting certain Capco prospective clients.  Under Section 6.3.2 of the BPA, Halpern agreed that, during the Restricted Period, he would not "solicit the business or custom of any Potential Client with a view to providing services to that Potential Client in competition with any Restricted Business."

32.     Potential Client is defined in the BPA as any person, firm, company or entity:

a) which was in discussions or negotiations with the Company or any Group Company with a view to becoming a client;

b) in relation to which, the Company or any Relevant Group Company had expended significant time or resources with a view to that person, firm, company or entity becoming a Client; or

c) to which the Company or any Relevant Group Company had pitched or was preparing to pitch with a view to that person, firm, company or entity becoming a client,

(in each case) during the [twelve (12) month period immediately prior to the termination of employment], and with which discussions, negotiations, efforts or pitch you were either materially concerned, had material personal contact or were privy to Confidential Information (in each case) during the [twelve (12) month period immediately prior to the termination of employment].

33.     The BPA included additional restrictions limiting Halpern's ability to engage with Capco clients during the Restricted Period. In Section 6.3.3, Halpern agreed that, during the Restricted Period, he would not be involved with the provision of services to or otherwise have any business dealings with "any Client in the course of any business concern which is in

---

[2] Under the BPA, Group Company is defined as "the Company, the Partnership and each other company, body corporate or other entity (together, an 'entity') that, either directly or indirectly including through one or more intermediaries either controls, is controlled by or is under common control with the Company[.]"

competition with the Restricted Business."  Similarly, in Section 6.3.4, Halpern agreed he would not be involved with the provision of services to or otherwise have any business dealings with "any Potential Client in the course of any business concern which is in competition with the Restricted Business."

34.    Halpern also agreed to robust protections of Capco's Confidential Information.[3] Specifically, Section 4.1 of the BPA states that Halpern:

> acknowledge[s] that in the course of [his] Employment [he] will have access to Confidential Information, and therefore [he] agree[s] to accept the restrictions in this clause 4. [He] will not (except in the proper course of your duties, as required by law or as authorised by the Company), use, copy, or communicate or disclose to any person any Confidential Information and/or trade secrets or confidential information of the Company or any Group Company or their affiliates, subsidiaries, clients and vendors.

35.    Section 4.2 likewise obligates Halpern to:

> use [his] best endeavours to prevent the use, copying, communication or disclosure by any other person, company or organisation whatsoever of any Confidential Information and/or trade secrets and confidential information of the Company or any Group Company or their affiliates, subsidiaries, clients and vendors (except in the proper course of their duties, as required by law or as authorised by the Company)

---

[3] Under the BPA, Confidential Information is defined as "information (whether or not recorded in documentary form, or stored on any magnetic or optical disk or memory) relating to the business, products, affairs and finances of the Company or any Group Company for the time being confidential to the Company or any Group Company and trade secrets including, without limitation, technical data and know-how relating to the business of the Company or Group Company or any of their suppliers, customers, agents, shareholders or management, including in particular (but without limitation): a) business plans, financial information, pricing and fee arrangements, models, flow charts, information regarding costs, profits, markets, products; b) details of actual or potential clients and their requirements, client lists, engagement terms of clients, commercial terms with business partners, client relationship management information; c) inventions, ideas, concepts, know-how, marketing strategies, techniques, designs, discs, operating systems, research and development activities, tooling, designs, software, IT systems; d) litigation, potential litigation or legal advice; e) your Employment terms, the employment terms of other employees, the details of your subscription in the Partnership and/or your participation in the LTIP, the remuneration or performance of other employees; f) global incentives and reward plans, remuneration strategies, recruitment strategies, recruitment plans; g) details of technology, innovation, solutions or thought leadership which are in the course of development; h) plans for present and future development and expansion into new markets; and i) any information which is marked as 'confidential' (or similar), or which you are told is confidential or which you should realise to be confidential."

36.     Halpern explicitly acknowledged, in Section 6.1 of the BPA, because of his role as a Partner and the considerable resources Capco expended in developing its services and client relationships, and in order to protect Capco's Confidential Information, that "certain restrictions be placed [him] your activities after [he] leaves the business and that the restrictions in this Business Protection Agreement are reasonable."

37.     Halpern further acknowledged, in Section 6.8, that:

in the event that clause 6.3 is breached, the Company will be irreparably damaged. Therefore, should any dispute arise with respect to the breach or threatened breach of any such clause, [Halpern] agree[s] that, in addition to, and not in lieu of, any and all other remedies available to the Company, an injunction or restraining order or other equitable relief may be issued or ordered by a court of competent jurisdiction restraining any breach of any of such provisions. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

38.     Halpern further acknowledged, in Section 6.9 that "You entered into the restrictions in this clause 6 having had an opportunity to seek legal advice on the terms of this Business Protection Agreement and whether to enter into it. You acknowledge that the restrictions are reasonable in scope. . ."

39.     Halpern also agreed in Section 7.2 that he would "indemnify each Group Company against all liabilities, costs, expenses, damages and losses (including but not limited to any direct, indirect or consequential losses, loss of profits, loss of reputation and all interest penalties and legal costs (calculated on a full indemnity basis) and all other professional costs and expenses) suffered or incurred by each Group Company arising out of or in connection with [his] actual or alleged breach of the obligations set out in this Business Protection Agreement or in the event [he] assert that the obligations set out herein are unenforceable."

**D.**   **Capco's Additional Protections of its Confidential Information**

40.   In addition to the comprehensive confidentiality obligations outlined in the BPA, Capco has adopted additional protections for its systems and confidential information.

41.   For example, Capco has adopted various confidentiality, privacy and data security policies, including the Capco Code of Conduct, the Capco Information and Security Management Policy, and Data Protection Policy in order to closely guard its confidential information, to which Halpern has acknowledged and agreed to abide.

42.   In order to access any files at Capco, or even Capco electronic devices, employees must log in using a username and password.  Additionally, employees must connect via a Capco Virtual Private Network (VPN) which requires a unique passcode to be occasionally entered to access Company systems.

43.   Capco uses technology that prevents employees from transmitting any Company documents to personal accounts.  It logs each attempt to send a file to a personal account, and only allows the transmission documents to be sent if it is for a designated approved purpose.  Capco also prohibits, and uses technology that blocks, the transfer of documents onto external drives, such as USB "thumb drives."

44.   Capco's offices are locked and not accessible to anyone who is not an employee or invited.

**E.**   **Isaac Halpern's Self-Assessment for His Promotion to Partner at Capco[4]**

45.    While Capco has 6,231 employees globally and 1,262 in the United States, it has only 73 Partners and 50 Associate Partners globally, and 21 Partners and 11 Associate Partners in the United States. The level Halpern held before partner was Managing Principal, and there are

---

[4] Not sure whether we should include this.

353 Managing Principals globally and 94 in the United States.When a Capco executive is evaluated for potential promotion to Partner, one part of that process is that the prospective Partner presents a business case for his or her promotion.

46.    In his Partner Presentation Deck, Halpern described his vision as follows: "I will continue to build a world-class strategy team aligned with digital & domains . . . With highly differentiated solutions . . . Making us sought after for the hardest jobs . . . Driving new growth (for our business and our people)."

47.    Additionally, in the deck, Halpern highlights what he views as his greatest accomplishments.  It notes that in 2016 he used strategy work as a wedge to secure over a million dollars in work for one client.  As for 2017 and 2018, Halpern highlights that he expanded two different strategy accounts to multi-year projects, used Strategy work to "enter and expand numerous new accounts," and used his strategy workshops as a "major selling tool."

48.    In terms of his contributions to growing the Strategy Practice team, Halpern noted that in 2016 he "started formal recruiting efforts, built core growth, organizational and digital offerings on the back of delivery, expanded strategy trainings, [and] led internal strategy efforts." As for 2017/2018, he highlights that he grew the Strategy Practice group to "50+ evangelists" and "expanded role in internal strategy and aligned with digital team, expanded internal and external recruiting . . . [and] greatly expanded offerings with enriched domain content."

49.    The deck also highlights the commercial impact Halpern had at Capco and his role as a salesperson.  He identified his "priorities" in the years ahead of "continu[ing] to drive growth & diversification by winning new logos & new net strategy projects, drive net new revenue as a client partner . . . [and] convert pull-through resulting from ongoing and recent strategy work."

F.   **Halpern's Responsibilities and Access to Confidential Information as an Associate Partner, and later Partner, Generally**

50.   All Partners at Capco work together synergistically to lead and grow its business. To that end, they routinely meet and collaborate across practice groups and offices.

51.   As a Partner (and previously Associate Partner), Halpern was involved, and regularly participated, in partner-level meetings that spanned the Capco's divisions. Among other things, he attended twice-weekly Capco partner/leadership meetings, during which he was privy to financial strategies and forecasts, and significant clients' information across sectors.

52.   Halpern attended company-wide annual planning partner meetings. The most recent of such meetings occurred in early 2022.  During this meeting, Halpern received substantial confidential information about Capco's plans and future strategies.  For example, Halpern received comprehensive documents containing information that outlined Capco's blueprints for retaining current clients and attracting prospective clients, as well its plans and strategy for managing its competitive landscape, which competitors expressly include Halpern's new employer, EY-Parthenon.

53.   Through Capco's partner meetings, Halpern learned Capco's strategies with regard to expansion, domain, and people for all of Capco's sectors and divisions. As a result, he had unique access to confidential strategy information relating to all of Capco's clients across all of the sectors in which Capco operates.  All of this information is maintained as confidential by Capco, is not readily available to competitors, and would be detrimentally harmful to Capco if disclosed to or used by competitors.

54.   Halpern was involved with working with the Managing Partner of the US on developing Capco's own US strategy.

55.     Halpern also received information regarding clients that were considered "at risk" by Capco (i.e. clients or accounts that may be particularly vulnerable to competition), and the particular reasons.  He further had access to so-called client satisfaction data, as well as feedback on client's evaluations of Capco's services.

56.     As a Partner, Halpern also had access to all of Capco's internal sales and client systems and databases.  These databases contained detailed information about each of Capco's accounts, clients, and client prospects, which Halpern has occasion and opportunity to access.  This information includes, by way of example and without limitation: details about the work performed for each client and further business development opportunities with regard to each client; all revenue derived from each client and the fee structure utilized by Capco with each client; contact details and personal information concerning the key representatives of each clients; and each client's feedback on the work product Capco produced.

### G.     Halpern's Responsibilities as Capco's Head of Strategy

57.      Capco named Halpern its Head of Strategy, becoming the leader of Capco's Strategy business.

58.     Halpern's responsibilities as the Head of Strategy included, among other things, strategic planning, sales, and project delivery,

59.     Capco charged Halpern with developing and executing Capco's plan for its Strategy Practice.  To this end, Halpern led development of overall vision for the group, determined and set revenue aspirations, identified prospective clients, developed plans to secure target clients, strengthened and maintained existing client relationships, managed strategies to mitigate "at risk" clients, coordinated with client partners to find ways to grow business, and identified products and services the Strategy team should develop.  He was also responsible for marketing as well as otherwise positioning Capco in the Strategy space.

60. The Strategy Practice has a Fiscal Year 2023 planned revenue of approximately $20,000,000. A significant percentage of the Strategy Practice's past total revenue comes from clients where Halpern had client partnership responsibility (Guardian Life Insurance and EastWest Bank).

61. Capco presented Halpern to clients across the business as a key part of the US executive leadership team. For example, Halpern was highly visible and presented as part of the Capco executive leadership team to Morgan Stanley, a client from which Capco derives approximately $40,000,000 in revenue. Indeed, Halpern is a particularly key part of Capco's relationship with Morgan Stanley, as approximately 60% of the work Capco performs for Morgan Stanley relates to its Wealth practice, a space in which Halpern is a recognized leader. Halpern also provides services to Silicon Valley Bank, which is responsible for approximately $35,000,000 in revenue.

62. Halpern was also instrumental in broader sales initiatives. These initiatives involved collaboration across groups and clients, and further exposed Halpern to extensive highly sensitive confidential information across Capco's platform. He was privy to, among other things, Capco's growth plans for its Strategy Practice across industries, including information concerning current clients and target clients. He was also privy to particular client development plans, as well as the business themes associated with building out these services and developing clients. He also received extensive information concerning pressures Capco faced, its self-assessment of strengths and weaknesses (including areas and clients that may be particularly vulnerable to competition), and identified areas of opportunity for growth.

63. As the Head of Strategy, Halpern was also responsible for leading a team of over 60 strategy professionals. He acted as a teacher, coach, and guide, to this team. He recruited new

team members, had broad hiring authority, engaged in performance management, and was involved in promotion decisions.  He also worked to help improve the profile of his team, and orchestrated the team's involvement with other parts of the Capco business.

64.     Incident to these leadership responsibilities, Halpern had access to extensive confidential personnel and recruiting information, including compensation schemes, individuals' compensation packages, performance reviews, recruiting strategy, and applicant pipeline.  This included access to information regarding employees' aptitudes and potential for advancement (or not), such that he would also be privy to potentially at risk employees

65.     Halpern had access to all the highly confidential information and individualized information that his strategy professionals maintained on clients that they respectively serviced.

66.     In terms of Halpern's individual responsibilities, selling the services of the Strategy Practice and revenue generation and client relationship building were key aspects of Halpern's role.  Indeed, approximately 80% of Halpern's bonus was dependent upon his ability to generate new business and expand existing relationships.

67.     At the sales stage, Halpern was responsible for working with other partners in the business to identify Strategy Project opportunities. Once Halpern and his partners identified a target, Halpern would then help create and participate in the pitch.  As part of this work, and making use of Capco's highly confidential information, tailored for use with each individual client, he helped position Capco as an expert in the industry, and help the team shape its proposals and identify how to differentiate Capco's services from competitors.  He also helped determine the proposed pricing, taking into account Capco's competitive intelligence on pricing and its economics.

68.     During pitches, Halpern was responsible for selling his group's capabilities, including his team's experiences with individual clients and on particular projects, as well as selling his own personal expertise.

69.     Once Halpern had successfully gone through the sale cycle and secured a new client or Project, he would move onto the project delivery stage.  He would work with his team to plan the project, determine appropriate deliverables, and staff the project with others to work with him. If the client was new to Capco, Halpern would be heavily involved in the review and negotiation process of a Master Services Agreement and rate card for the client.  Once this was complete, or if this was a new project for a preexisting client, he would then work with the client to create a statement of work for the engagement.

70.     Once the project based upon the statement of work was started, Halpern would provide overall Partner level supervision of the project and be the executive face of the project to the client.

71.     In addition to supervision, Halpern would work closely with the client to execute certain complex tasks that utilize his expertise and skills.  Among other things, Halpern developed uniquely tailored financial and organizational methodologies for numerous clients.  He would also execute what he termed his unique strategy workshop approach.

72.     Incident to this work in pitching and also going through his project delivery stage, Halpern learned unique information about what worked and did not work for each client – what resonated with them in terms of methodologies and strategies and techniques for meeting the client objectives

73.     Halpern developed close relationships with many clients across Capco's business. He learned their needs and preferences.   Among other client relationships, Halpern was the

designated Client Relationship Manager for Guardian Life Insurance, a significant Capco client, and EastWest Bank, which brought in approximately $3,500,000 in yearly revenue.

## H.   **Capco's Investment in Halpern**

74.    Throughout his employment, Capco actively supported Halpern and used its platform and goodwill to elevate Halpern's profile in strategy-based management consulting.

75.    To help raise his professional profile, Capco featured a number of different articles written by Halpern on its website, and promoted these articles on all of its social media channels.

76.    Capco invested significant resources in supporting Halpern's business development efforts, including but not limited to sending him to conferences across the country to enable him to build his personal brand and enabling him to maintain and strengthen Capco's relationships with its clients and to develop new ones.

77.    Capco submitted Halpern several times for speaking slots at high profile external industry conferences, such as Money2020.

78.    Capco provided Halpern with an expense account, which he used to entertain clients and deepen his relationships.  Over the course of his time at Capco, Halpern spent thousands of dollars of Capco's money entertaining clients and pursuing other client development initiatives.

79.    Capco gave Halpern a platform to grow his personal brand within Capco, spotlighting him and asking him to moderate the US Partner offsite on two separate occasions.

80.    Capco supported Halpern by introducing him to countless contacts at existing and potential clients.  Halpern presented at pitches during the Request for Proposal process, attended client roundtables, and participated in client networking events.

I.     <u>**Halpern's Resignation from Capco**</u>

81.     On July 21, 2022, Halpern sent an email to Capco Human Resources Director Mary Keller and U.S. Regional Business Lead Michael Ethelston announcing his intent to terminate his employment with Capco effective August 5, 2022.

82.     On July 21, 2022 Keller and Ethelston met with Halpern to discuss his exit and career plans.  Halpern informed them that he was deciding between three different opportunities at three different types of consultancies.  He noted, however, that he would be going to work in a "Strategy leadership role."

83.     During that meeting he also noted that he was going to be meeting with Silicon Valley Bank that afternoon, a roughly $35,000,000 per year Capco client, to discuss deliverables for a project that he was working on and was concerned about how the transition of Silicon Valley Bank work would happen.

84.     On July 26, 2022, Keller sent a letter to Halpern reminding him of his obligations under the BPA.  In the letter, Halpern was asked to sign the following affirmation: "I confirm my understanding of, and agreement to, my ongoing obligations under the Employment Contract and the BPA and the obligations set out in this letter."  Halpern did not sign this affirmation.

85.     On or around August 2, 2022, Ethelston and Keller met with Halpern.  During this conversation, Halpern told them that he would be joining EY Parthenon ("EYP") as a Principal on the Strategy Team.  He shared that his work would be cross-industry, but heavily focused on Financial Services.  During the conversation, Halpern referred to his new employer as "Parthenon" and was reluctant to reference EY, and the fact that he was joining *EY Parthenon*.  In this conversation, Halpern acknowledged that EYP was a Company that Capco would consider a competitor.

86.    Halpern expressed to Ethelston that he did not agree to comply with the BPAt. Instead, he suggested that he would only agree to certain limited restrictions with regard to his ability to contact a subset of Capco's clients, which was not nearly the entirety of the vast universe of clients for which Halpern had responsibility or about which Halpern had knowledge.

87.    As Halpern was transitioning his responsibilities, but before his final day, Halpern informed Ethelston that several clients had contacted him.

88.    On information and belief, several clients Halpern developed at Capco have continued to contact him.

89.    There is a significant risk that these clients will follow Halpern to his next employer.  Clients following an executive, particularly one of Halpern's stature, to a new employer is quite common.

90.    One of the reasons that Capco enters into BPAs is to protect its goodwill by preventing executives from going to work for competitors in competitive roles for a period of time so that Capco can secure the pre-existing client relationship.

**J.      Halpern's Anticipated Role at EYP**

91.     Unless enjoined, Halpern intends to join EYP as a Principal and Partner and be a leader of its Strategy practice.

92.    EYP is EY's management consulting arm.

93.    On its website, EYP describes its business as helping "CEOs and business leaders design and deliver transformative strategies across the entire enterprise, to help build long-term value to all stakeholders."

94.    Like Capco, EYP has a Strategy group that provides the same type of services that Capco provides.

95.     Capco routinely identifies its competitors for purposes of strategy and internal analysis.  EYP is included on these lists.

96.     As EYP is a direct competitor, Capco routinely competes directly against EYP for clients and projects, particularly with regard to strategy projects.

97.     While Capco may have fewer employees than EYP, one of its greatest strengths and highest profile practices, is its Strategy Practice consulting arm, which allows it to go head to head with EYP on strategy projects.

98.     EYP uses the hire of a new Partner as a marketing opportunity.  The hiring is treated with great fanfare, and EYP issues a press release, which on information and belief it attempts to place in industry publications.

99.     On information and belief, every Principal and Partner is expected to generate revenue.

100.    There is significant overlap of clients with whom Halpern worked at Capco, after capitalizing on Capco's goodwill, and those that he would necessarily be looking to attract as a Principal in EYP's Strategy team.

101.    Halpern has openly acknowledged that he intends to solicit financial services clients for EYP.  Additionally, he will be part of the same EYP team before and after the expiration of the term of his restrictions under the BPA.

102.    Given the competitive nature of the business, EYP is, without question, already targeting many of the same clients as Capco.  As a leader of the strategy team, Halpern would necessarily be involved in some respect, even if indirectly, with winning these clients for EYP.

103.    Having access to Capco's confidential information would extremely desirable to EYP and give it an immense competitive advantage on the commercial battlefield.

104.    Capco's Confidential Information that would be of immense value to EYP includes, but is not limited to, Capco's: client list, key contacts at existing and prospective clients, pricing information, pipeline business, client development plans, self-identified strengths and weaknesses, and strategies for originating and delivering products.  All of this information would help EYP craft a strategy that would allow it to compete unfairly with Capco.

### COUNT I
**(Breach of Contract)**

105.    Capco realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 103 above.

106.    Halpern breached the BPA by, within twelve (12) months after his separation from Cacpo, accepting employment, and otherwise being involved, with EYP.

107.    Capco has performed all of its duties under the BPA.

108.    Capco has bene injured and will continue to be injured by Halpern's breach of the BPA in an amount that cannot readily be ascertained or compensated by money damages.

109.    As a direct and proximate result of Halpern's breach of the terms of his agreement, Capco has an will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, Capco is entitled to a temporary restraining order and a preliminary injunction.

### COUNT II

**(Declaratory Judgment)**

110.     Capco realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 103 above.

111.    By accepting a position at EYP and otherwise expressing an intent to not fully comply with the restrictive covenants outlined in the BPA, Halpern has effectively taken the

position that New York law purportedly prohibits Capco from enforcing certain provisions in the BPA against him, including, but not limited to, Section 6.3.1., 6.3.2., 6.3.3., 6.3.4., and 6.3.10.

112.     Halpern's position has also been made clear by his refusal to acknowledge that each restriction in the BPA is lawful and enforceable.

113.     Capco has taken the position that there is no legal basis for Halpern's position.

114.     By virtue of the foregoing, there now exists an actual, justiciable controversy between Capco and Halpern relating to their respective legal rights, duties, and obligations, which controversy is ripe for adjudication.

115.     Declaratory relief will resolve the legal issues between the parties pertaining to the enforceability of the BPA.

116.     Capco thus requests a judgment declaring that the BPA is enforceable as applied to Halpern's anticipated employment with EYP.

## PRAYER FOR RELIEF

WHEREFORE, Capco seeks judgment in its favor and an Order against Halpern that grants the following relief:

1.     A temporary restraining order and expedited discovery, and following a hearing;

2.     A preliminary injunction order that, in accordance with the BPA, enjoins Halpern, from[5], for a period of twelve months after August 5, 2022:

   a.  Directly or indirectly, either alone or jointly with or on behalf of EYP or any person, firm company or entity, "in any Capacity be involved with any business concern situated within the Territory or which provides services to Clients situated within the Territory which is, will be, or is planning to be in competition with any Restricted Business[.]"

   b.  Directly or indirectly, either alone or jointly, with or on behalf of EYP or any person, firm, company or entity and in any capacity, solicit or endeavor to entice away from the Company, or any Group Company, "the business or custom of any

_____

[5] With all terms having the definition provided in the BPA.

Client with a view to providing services to that Client in competition with any Restricted Business[.]" or "solicit the business or custom of any Potential Client with a view to providing services to that Potential Client in competition with any Restricted Business."

    c.   Directly or indirectly, either alone or jointly, with or on behalf of EYP or any person, firm, company or entity and in any capacity be involved with the provision of services to, or otherwise have any business dealings with, any Client or Prospective Client in the course of any business concern that is in competition with the Restricted Business.

    d.   Directly or indirectly either alone or jointly, with or on behalf of EYP or any person, firm, company or entity, employing or engaging, soliciting the employment or engagement, or assisting any other person (whether by means of the supply of names or expressing views on suitability or otherwise) to employ or engage or solicit or otherwise endeavor to entice away from the Company or any Group Company any Key Employee.

3.    A preliminary injunction order that, in accordance with the BPA, enjoins Halpern, from, in perpetuity, using, copying, communicating, or disclosing to EYP or any person any Confidential Information and/or trade secrets or confidential information of the Company or any Group Company or their affiliates, subsidiaries, clients and vendors.

4.    Awarding Capco such further relief as the Court deems necessary and just.

5.    Plaintiff demands trial by jury on all issues properly so tried.

Dated:  September 8, 2022

_____
John P. Barry
john.barry@weil.com
Rebecca J. Sivitz
rebecca.sivitz@weil.com
Celine J. Chan
celine.chan@weil.com
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007