**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

THE CAPITAL MARKETS COMPANY, LLC,

                   Plaintiff,

vs.

ISAAC HALPERN,

                   Defendant.

Civil Action No.

---

### DECLARATION OF MICHAEL ETHELSTON IN SUPPORT OF PLAINTIFF'S ORDER TO SHOW CAUSE FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

I, Michael Ethelston, hereby declare under oath and subject to the penalties of perjury the following:

1.      I submit this Declaration in support of Plaintiff's Order to Show Cause for a Temporary Restraining Order and Preliminary Injunction. I am familiar with the facts and circumstances herein, which, unless expressly specified, are based upon my personal knowledge. If I were called upon to testify, I could and would testify competently as to the facts set forth herein.

2.      I joined The Capital Markets Company (UK) Limited in November 2017 as a Partner and the Head of Mergers and Acquisitions. Within a few weeks, I was asked to become Managing Partner of the United Kingdom division. My current job title is Partner, and Managing Partner of the United States, and I am now employed by The Capital Markets Company, LLC ("Capco"), a U.S. entity. In this role, I am responsible for leading Capco's operations in the United States and in Brazil.

3.     I have over 30 years of experience in financial services, and over 24 years of professional services advisory and delivery experience, with special expertise in retail and commercial banking.

4.      I am deeply familiar with the practices and norms in the consulting industry.  Prior to joining Capco, I spent over 20 years with Accenture, where I was a Partner and led the business process operations business for Accenture Financial Services in Europe, Africa, and Latin America.

5.     At the time of his resignation, Isaac Halpern ("Halpern") reported directly to me.  I supervised Halpern's work, and had knowledge of his work product, duties, and responsibilities at Capco.

## I.     Capco's Services

6.     Capco is a global management and technology consultancy company that provides consulting, technological, and digital services. Capco's global teams collaborate with clients across the world to develop tailored solutions that address complex business challenges.

7.     One of Capco's core offerings is its Strategy Practice.  The Strategy Practice works with clients to develop focused, actionable and effective strategic responses to the most difficult business challenges facing the clients, which, in turn, will help drive sustained revenue growth and enhance overall business operations.  This requires members and particularly the leaders of the Strategy Practice to develop a deep understanding of Capco's clients in order to help the clients to (a) recognize the challenges to the business and (b) develop plans to expand their product offerings, enter into new markets, or develop new business lines.  To make this happen, Capco's Strategy Practice works with clients to consider the needs of end consumers, align the client's offerings with those consumer needs, and provides strategic advice on the most effective way to implement the required changes.

8.     While the offerings of Capco's Strategy Practice are expansive, an example is illustrative.  A wealth manager client may engage Capco's Strategy Practice to assist it with expanding its offerings or attracting a particular type of client segment.  Capco would help the wealth manager understand the needs of this potential new market, find opportunities for the wealth manager's current or potential offerings with prospective clients, develop a business plan, and help the wealth manager implement the plan.

9.     The Strategy Practice is one of Capco's marquee practices, which for Capco's current fiscal year is anticipated to bring in approximately $20,000,000 in revenue, and is a major player in the consulting space.  Its clients include household names, including Morgan Stanley, Silicon Valley Bank and Guardian Life Insurance.

10.     Capco's US clients generally fall into three categories: (1) financial services institutions, such as banks; (2) companies offering financial service type products, such as Apple and Apple Pay[1]; and (3) financial technology partners (commonly referred to as Fintech).

11.     Capco's Strategy Practice fiercely competes against Ernst & Young, Deloitte, PWC, and KPMG (the "Big Four") and other major consulting firms, for clients and projects.  As outlined in the recent FY23 US Services Strategy Refresh document, which Halpern was instrumental in developing as the leader of the Strategy Practice, Capco identifies the core competitors of the Strategy Practice to include, Ernst and Young ("EY") (specifically calling out EY-Parthenon ("EYP")).

12.     Capco's Strategy Practice is critical to its larger enterprise.  Performing strategy work is often Capco's entre into forming a broader relationship with clients, which, in turn, leads to work in other areas for Capco.  For example, providing payments strategy work for Silicon

---

[1] Apple is not a Capco customer, and is referenced here as an illustrative example.

WEIL:\98789107\8\33615.0008

Valley Bank evolved into providing Silicon Valley Bank with other implementation work to execute the suggestions of the Strategy Practice. As such, Partners across practices work together to, among other things, identify ways to best serve, and expand, Capco clients.

## II.     Isaac Halpern's Initial Employment with Capco

13.     Halpern joined Capco in 2014 as a Managing Principal. In this role, Halpern had broad cross-industry responsibilities.

14.     Halpern was highly compensated. At the time of his separation, he was earning over $700,000 per year in base salary and incentive compensation.

15.     Halpern was formally assigned to Capco's Washington, DC office. However, his role and client responsibilities as a Managing Principal, and later as an Associate Partner and Partner, were national in scope (in line with the reach of Capco's Strategy Practice).

16.     Halpern accurately described his responsibilities as a Managing Principal in his LinkedIn profile:

> Led growth, digital strategy, and organizational design projects for clients in Capital Markets, Housing Finance, Wealth, Asset Management, and Retail Banking. In addition to project delivery, responsibilities included: developing solutions and taking them to market; recruiting and building a high-talent team; working with firm leadership to develop and execute Capco's strategy; leading complex client service and business development efforts, and; coaching, training, and mentoring team members.

A true and correct copy of Halpern's LinkedIn profile as of August 30, 2022 is attached hereto as Exhibit A.

## III.    Isaac Halpern's Self-Assessment for His Promotion to Associate Partner

17.     While Capco has 6,231 employees globally and 1,262 in the United States, it has only 73 Partners and 50 Associate Partners globally, and 21 Partners and 11 Associate Partners in the United States. The level Halpern held before Associate Partner was Managing Principal, and there are 353 Managing Principals globally and 94 in the United States.

WEIL:\98789107\8\33615.0008

18.     When a Capco executive is evaluated for potential promotion to Partner, one part of that process is that the prospective Partner presents a business case for his or her promotion. A true and correct copy of Halpern's Associate Partner Presentation Deck is attached hereto as Exhibit B ("Associate Partner Presentation Deck").

19.     In his Associate Partner Presentation Deck, Halpern described his vision as follows: "I will continue to build a world-class strategy team aligned with digital & domains . . . With highly differentiated solutions . . . Making us sought after for the hardest jobs . . . Driving new growth (for our business and our people)." (*punctuation in original*).

20.     Additionally, in the deck, Halpern highlights what he views as his greatest accomplishments. It notes that in 2016 he used strategy work as a wedge to secure over a million dollars in work for one client. He also notes that he secured critical wins at another financial institution "beating OW [Oliver Wyman], BCG [Boston Consulting Group], and PWC [PricewaterhouseCoopers]." As for 2017 and 2018, Halpern highlights that he expanded two different strategy accounts to multi-year projects, used Strategy work to "enter and expand numerous new accounts," and used his strategy workshops as a "major selling tool."

21.     In terms of his contributions to growing the Strategy Practice team, Halpern noted that in 2016 he "started formal recruiting efforts, built core growth, organizational and digital offerings on the back of delivery, expanded strategy trainings, [and] led internal strategy efforts." As for 2017/2018, he highlights that he grew the Strategy Practice group to "50+ evangelists" and "expanded role in internal strategy and aligned with digital team, expanded internal and external recruiting . . . [and] greatly expanded offerings with enriched domain content."

22.     In this deck, Halpern also spoke to the value of his strategy work. He noted that he was working to meet client needs, and that these needs "are not always well served by MBB

WEIL:\98789107\8\33615.0008

[McKinsey, Bain, and BCG] & Big 4 [EY, Deloitte, PWC, KPMG]." He also wrote that the Strategy team's work is a key part of growing Capco's business, as it allows them to "enter at the left of the sales cycle, drive diversification, improve . . . positioning for net new opportunities and digital transformation." He further noted that the Strategy Practice would help Capco achieve its brand aspirations, in part, but helping it "swim out of the 'red ocean' or price competition."

23.     The deck also highlights the commercial impact Halpern had at Capco and his role as a salesperson. He identified his "priorities" in the years ahead of "continu[ing] to drive growth & diversification by winning new logos & new net strategy projects, drive net new revenue as a client partner . . . [and] convert pull-through resulting from ongoing and recent strategy work."

IV.     **Isaac Halpern's Promotion to Associate Partner and Contractual Obligations**

24.     Effective July 1, 2018, Capco promoted Halpern to Associate Partner.

25.     Being promoted to Associate Partner at Capco is a significant accomplishment. Capco's Associate Partners are key leaders of its business.

26.     Capco's Associate Partners and Partners have vast access to Capco's highly confidential and most sensitive information (including concerning Capco employees, clients and client prospects, and Capco cost and pricing information), and Capco invests in its Associate Partners and Partners and uses its goodwill to help them establish and deepen client relationships. To protect these interests, and others, Capco requires that its Associate Partners and Partners execute what Capco refers to as its Business Protection Agreement ("BPA") as a condition of their promotion.

27.     Halpern signed the BPA and accepted its terms on July 1, 2018. A true and correct copy of the BPA DocuSigned by Halpern is attached hereto as Exhibit C.

28. The BPA imposes upon various restrictions relating to post-employment conduct and Capco's confidential information. Among other things, Halpern's BPA prohibits him from, for twelve (12) months following the cessation of his employment with Capco, being involved in any business that competes with Capco's offerings with which Halpern was materially involved in the twelve (12) months prior to the termination of his employment.

29. Halpern's BPA also restricts him from, among other things, soliciting or being involved in the provision of services to any current or prospective clients with a view to providing services to clients in competition with the services with which he was involved at Capco in the past twelve (12) months.

30. In exchange for agreeing to the terms of the BPA, Associate Partners and Partners receive significant financial benefits and incentive compensation. Halpern, for example, had the opportunity to participate in Capco's Long Term Incentive Plan, as well as benefit from highly attractive incentive schemes. Additionally, their promotion to Associate Partner or Partner is contingent upon execution of the BPA.

31. In addition to the comprehensive confidentiality obligations outlined in the BPA, Capco has adopted additional protections for its systems and confidential information.

32. For example, Capco has adopted various confidentiality, privacy and data security policies, including the Capco Code of Conduct, the Capco Information and Security Management Policy, and Data Protection Policy in order to closely guard its confidential information, to which Halpern has acknowledged and agreed to abide. Copies of these policies are attached hereto as Exhibit D.

33. In order to access any files at Capco, or even Capco electronic devices, employees must log in using a username and password. Additionally, employees must connect via a Capco

WEIL:\98789107\8\33615.0008

Virtual Private Network (VPN) which requires a unique passcode to be occasionally entered to access Company systems.

34.     Capco uses technology that prevents employees from transmitting any Company documents to personal accounts.  It logs each attempt to send a file to a personal account, and only allows the transmission documents to be sent if it is for a designated approved purpose.

35.     Capco also prohibits, and uses technology that blocks, the transfer of documents onto external drives, such as USB "thumb drives."

36.     Capco's offices are locked and not accessible to anyone who is not an employee or invited.

## V.     Isaac Halpern's Promotion to Partner

37.     In July 2021, Capco evaluated the case for Halpern's promotion from Associate Partner to Partner.

38.     As he did for promotion to Associate Partner, Halpern gave a presentation concerning the case for his promotion to Partner and created an accompanying deck.

39.     A true and correct copy of Halpern's Partner Presentation Deck is attached hereto as Exhibit E ("Partner Presentation Deck").

40.     In the Partner Presentation Deck, Halpern highlights that he has driven growth through collaboration in the US and globally.  He also characterizes himself as "laser focused on positioning Capco as a strategic advisor on the most important decisions that our clients face– driving profitable growth for our business."

41.     He also notes that his team "has developed a winning playbook and robust solutions that we've taken to market to regularly beat the MBB, Big 4, and others."

42.     Speaking to the immense impact the strategy team has on Capco's operations as a whole, he noted how, in 2021, for each $1.00 that the Strategy Practice generated, Capco gained an additional $3.50 in revenue related to additional work performed by other groups (referred to as "pullthrough").

43.     On September 1, 2021, Capco promoted Halpern from Associate Partner to Partner.

## VI.     Isaac Halpern's Responsibilities and Access to Confidential Information as an Associate Partner and Partner, Generally

44.     All Associate Partners and Partners at Capco work together synergistically to lead and grow its business.  To that end, they routinely meet and collaborate across practice groups and offices.

45.     Halpern was no exception to this general practice.  As a Partner (and previously Associate Partner), he was involved, and regularly participated, in partner-level meetings that spanned Capco's divisions.  Among other things, he attended twice-weekly Capco partner/leadership meetings, during which he was privy to financial strategies and forecasts, and significant clients' information across sectors.

46.     Halpern also attended company-wide annual planning partner meetings. The most recent of such meetings occurred in early 2022.  During this meeting, Halpern received substantial confidential information about Capco's plans and future strategies.  For example, Halpern received comprehensive documents containing information that outlined Capco's blueprints for retaining current clients and attracting prospective clients, as well its plans and strategy for managing its competitive landscape, which competitors expressly include Halpern's new employer, EYP.

47.     Through Capco's partner meetings, Halpern also learned Capco's strategies with regard to expansion, domain, and people for all of Capco's sectors and divisions. As a result, he had unique access to confidential strategy information relating to all of Capco's clients across all

of the sectors in which Capco operates. All of this information is maintained as confidential by Capco, is not readily available to competitors, and would be detrimentally harmful to Capco if disclosed to or used by competitors.

48.     Halpern used this confidential information in the course of carrying out his job responsibilities with Capco. For example, Halpern developed a deck labeled "FY23 US Services Strategy Refresh." This 17-page document goes into great detail regarding Capco's Strategy Practice business. The presentation:

- Highlights market context by outlining a number of trends it has identified internal to Capco surrounding the group's brand reputation, bandwidth, and skill gaps. It then proceeds to highlight external trends that, after the investment of significant time and effort, Capco has identified in the market.

- Outlines Capco's competitor landscape, identifying the companies that Capco considers to be its greatest competitors, and how Capco intends to compete. EYP is included and discussed at length in the document.

- Discusses marketing opportunities for the Strategy Practices that Capco has identified, including various industry demands and opportunities growing out of marketing conditions.

- Highlights the risks Capco has identified with regard to pursuing these opportunities, as well as ways to mitigate these risks.

- Goes through in-depth data concerning Capco's historical performance, and key takeaways and opportunities it has identified as a result of examining Capco's historical performance.

- Features a chart containing each business development strategy Capco is considering and potential client targets for each of these strategies.

- Provides "reference material" which includes the weighted revenue from each of Capco's strategy clients.

49.     A copy of this presentation is attached hereto as Exhibit F.[2]

---

[2] Filed Under Seal.

WEIL:\98789107\8\33615.0008

50.     Additionally, Halpern was involved with working with the Managing Partner of the US, most recently me, on developing Capco's own US strategy.  This was another capacity in which he received and worked with Capco's highly sensitive confidential information.   For example, he put together a "Global Strategy" deck that includes, among other things, a comprehensive discussion of Capco strategies to manage market risks, key growth opportunities and targets for expansion, strategies for growth in each of Capco's sectors, and detailed revenue information by industry and client.  A working draft of a comprehensive strategy document that Halpern put together for Capco with his team, in attached hereto as Exhibit G.[3]

51.     Halpern also received information regarding clients that were considered "at risk" by Capco (i.e. clients or accounts that may be particularly vulnerable to competition), and the particular reasons.  He further had access to so-called client satisfaction data, as well as feedback on client's evaluations of Capco's services.

52.     Halpern was an active participant in both the annual meeting and the bi-weekly meetings.

53.     As an Associate Partner and Partner, Halpern also had access to all of Capco's internal sales and client systems and databases, and accessed and used this information in performing his job at Capco.  These databases contained detailed information about each of Capco's accounts, clients, and client prospects, which Halpern has occasion and opportunity to access.  This information includes, by way of example and without limitation: details about the work performed for each client and further business development opportunities with regard to each client; all revenue derived from each client and the fee structure utilized by Capco with each client;

---

[3] Filed Under Seal.

contact details and personal information concerning the key representatives of each clients; and each client's feedback on the work product Capco produced.

## VII.  Isaac Halpern's Responsibilities as Capco's Head of Strategy

54.  Capco named Halpern its Head of Strategy, becoming the leader of Capco's Strategy business.

55.  Halpern's responsibilities as the Head of Strategy were critical to Capco and multifaceted.  They included, among other things, strategic planning, sales, and project delivery,

56.  Capco charged Halpern with developing and executing Capco's plan for its Strategy Practice.  To this end, Halpern led development of overall vision for the group, determined and set revenue aspirations, identified prospective clients, developed plans to secure target clients, strengthened and maintained existing client relationships, managed strategies to mitigate "at risk" clients, coordinated with client partners to find ways to grow business, and identified products and services the Strategy team should develop.  He was also responsible for marketing as well as otherwise positioning Capco in the Strategy space.

57.  The Strategy Practice is anticipated to bring in approximately $20,000,000 for Capco's latest fiscal year.  A significant amount of this total revenue comes from clients where Halpern had client partner responsibilities (Guardian Life Insurance and EastWest Bank).

58.  As the Head of Strategy, Halpern also collaborated with leaders in other groups to grow Capco's business.  Capco presented Halpern to clients across the business as a key part of the US's executive leadership team.  For example, Halpern was highly visible and presented as part of the executive leadership team to Morgan Stanley, a client from which Capco derives approximately $40,000,000 in revenue.  Indeed, Halpern is a particularly key part of Capco's relationship with Morgan Stanley, as approximately 60% of the work Capco performs for Morgan

WEIL:\98789107\8\33615.0008

Stanley relates to its Wealth practice, a space in which Halpern is a recognized leader. Halpern also provides services to Silicon Valley Bank, which is responsible for roughly $35,000,000 in revenue.

59.     Capco's Strategy Practice often functions as the tip of the spear for facilitating additional and deeper client relationships for Capco more broadly. As such, Halpern was instrumental in broader sales initiatives. These initiatives involved collaboration across groups and clients, and further exposed Halpern to extensive highly sensitive confidential information across Capco's platform. He was privy to, among other things, Capco's growth plans for its Strategy Practice across industries, including information concerning current clients and target clients. He was also privy to particular client development plans, as well as the business themes associated with building out these services and developing clients. He also received extensive information concerning pressures Capco faced, its self-assessment of strengths and weaknesses (including areas and clients that may be particularly vulnerable to competition), and identified areas of opportunity for growth.

60.     As the Head of Strategy, Halpern was also responsible for leading a team of over 60+ strategy professionals. He acted as a teacher, coach, and guide, to this team. He recruited new team members, had broad hiring authority, engaged in performance management, and was involved in promotion decisions. He also worked to help improve the profile of his team, and orchestrated the team's involvement with other parts of the Capco business.

61.     By extension, Halpern had access to all the highly confidential information and individualized information that his strategy professionals maintained on clients that they respectively serviced.

62.    Incident to these leadership responsibilities, Halpern had access to extensive confidential personnel and recruiting information, including compensation schemes, individuals' compensation packages, performance reviews, recruiting strategy, and applicant pipeline. This included access to information regarding employees' aptitudes and potential for advancement (or not), such that he would also be privy to potentially at risk employees.

63.    In terms of Halpern's individual responsibilities, selling the services of the Strategy Practice and revenue generation and client relationship building were key aspects of Halpern's role. Indeed, approximately 80% of Halpern's bonus was dependent upon his ability to generate new business and expand existing relationships.

64.    In 2022, Halpern's base salary was $425,000 per year, and he was awarded a bonus of $285,000.

65.    At the sales stage, Halpern was responsible for working with other partners in the business to identify Strategy Project opportunities. Once Halpern and his partners identified a target, Halpern would then help create and participate in the pitch. As part of this work, and making use of Capco's highly confidential information, tailored for use with each individual client, he helped position Capco as an expert in the industry, and help the team shape its proposals and identify how to differentiate Capco's services from competitors. He also helped determine the proposed pricing, taking into account Capco's competitive intelligence on pricing and its economics.

66.    During pitches, Halpern was responsible for selling his group's capabilities, including his team's experiences with individual clients and on particular projects, as well as selling his own personal expertise.

WEIL:\98789107\8\33615.0008

67. Once Halpern had successfully gone through the sale cycle and secured a new client or Project, he would move onto the project delivery stage. He would work with his team to plan the project, determine appropriate deliverables, and staff the project with others to work with him. If the client was new to Capco, Halpern would be heavily involved in the review and negotiation process of a Master Services Agreement and rate card for the client. Once this was complete, or if this was a new project for a preexisting client, he would then work with the client to create a statement of work for the engagement.

68. Once the project based upon the statement of work was started, Halpern would provide overall Partner level supervision of the project and be the executive face of the project to the client.

69. In addition to supervision, Halpern would work closely with the client to execute certain complex tasks that utilize his expertise and skills. Among other things, Halpern developed uniquely tailored financial and organizational methodologies for numerous clients. He would also execute what he termed his unique strategy workshop approach.

70. Incident to this work in pitching and also going through his project delivery stage, Halpern learned unique information about what worked and did not work for each client – what resonated with them in terms of methodologies and strategies and techniques for meeting the client objectives.

71. Halpern developed close relationships with many clients across Capco's business. He learned their needs and preferences. Among other client relationships, Halpern was the designated Client Relationship Manager for Guardian Life Insurance, a significant Capco client, and EastWest Bank, which made up a significant percentage of the total revenue of the Strategy Practice.

WEIL:\98789107\8\33615.0008

## VIII.  Capco's Investment in Isaac Halpern

72.     Throughout his employment, Capco actively supported Halpern and used its platform and goodwill to elevate Halpern's profile in strategy-based management consulting.

73.     To help raise his professional profile, Capco featured a number of different articles written by Halpern on its website, and promoted these articles on all of its social media channels. This exposure was significant, as Capco's LinkedIn channel alone has over 192,000 followers.

74.     Capco also invested significant resources in supporting Halpern's business development efforts, including but not limited to sending him to conferences across the country to enable him to build his personal brand and enabling him to maintain and strengthen Capco's relationships with its clients and to develop new ones.  For example, Capco paid for Halpern to attend IN|VESTWEST, a conference in San Francisco, California that brings together executives from across the wealth management community.   In describing his experience in an article, Halpern stated: "In|Vest presented an opportunity to engage, listen and learn from leading players in the industry on the strategic questions they're asking and what's keeping them up at night.  There was so much information that after two days my head was spinning."  A true and correct copy of this article is attached hereto as Exhibit H.

75.     Capco submitted Halpern several times for speaking slots at high profile external industry conferences, such as Money2020.

76.     Capco also provided Halpern with an expense account, which he used to entertain clients and deepen his relationships.  Over the course of his time at Capco, Halpern spent thousands of dollars of Capco's money entertaining clients and pursuing other client development initiatives.

77.     Capco gave Halpern a platform to grow his personal brand within Capco, spotlighting him and asking him to moderate the US Partner offsite on two separate occasions.

WEIL:\98789107\8\33615.0008

78.     Capco also supported Halpern by introducing him to countless contacts at existing and potential clients.  Halpern presented at pitches during the Request for Proposal process, attended client roundtables, and participated in client networking events.

## IX.     Isaac Halpern's Resignation from Capco

79.      On July 21, 2022, Halpern sent an email to Capco Human Resources Director Mary Keller and me.  In the email, Halpern told me that he intended to terminate his employment with Capco effective August 5, 2022.

80.     In the e-mail, Halpern recognized how Capco had helped him grow professionally, writing that: "I greatly appreciate the opportunities that Capco has afforded me for personal and professional growth. It has been a privilege to . . . build and lead a world-class Strategy practice and see the impact that we were able to make for our clients, our team members, and our business." A copy of this e-mail is attached hereto as Exhibit I.

81.     On July 21, 2022 Mary Keller and I met with Halpern to discuss his exit and career plans.  Halpern informed me that he was deciding between three different opportunities at three different types of consultancies.  He noted, however, that he would be going to work in a "Strategy leadership role."

82.     During that meeting he also noted that he was going to be meeting with Silicon Valley Bank that afternoon, a $35,000,000 per year Capco client, to discuss deliverables for a project that he was working on and was concerned about how the transition of Silicon Valley Bank work would happen.

83.     On July 26, 2022, Ms. Keller sent me a copy of a letter she sent to Halpern reminding him of his obligations under the BPA.  In the letter, Halpern was asked to sign the following affirmation: "I confirm my understanding of, and agreement to, my ongoing obligations

under the Employment Contract and the BPA and the obligations set out in this letter." It is my understanding that Halpern did not sign this affirmation.

84.     A true and correct copy of Ms. Keller's letter to Halpern is attached hereto as Exhibit J.

85.     On or around August 2, 2022, I met with Halpern. During this conversation, Halpern told me that he would be joining EYP as a Principal in the Strategy Team. He shared that his work would be cross-industry, but heavily focused on Financial Services. During the conversation, Halpern referred to his new employer as "Parthenon" and was reluctant to reference EY, and the fact that he was joining *EY-Parthenon*. In this conversation, Halpern acknowledged that EYP was a Company that Capco would consider a competitor.

86.     Based on this conversation, it became clear to me that Halpern's new role at EYP would be virtually identical to his role at Capco.

87.     Through our conversations, it became clear to me that Halpern did not intend to adhere to his obligations under the BPA.

88.     Halpern is restricted under the BPA from soliciting any current or prospective clients with a view to providing services to clients in competition with the services with which he was involved at Capco in the past twelve (12) months. Halpern did not agree to comply with this requirement. Instead, he suggested that he would only agree to certain limited restrictions with regard to his ability to contact a subset of Capco's clients, which was not nearly the entirety of the vast universe of clients that Halpern had responsibility or knowledge of. It quickly became clear to me that Halpern would not be complying with the BPA's restrictions on him providing competitive services more generally.

WEIL:\98789107\8\33615.0008

89.     As Halpern was transitioning his responsibilities, but before his final day, Halpern informed me that several clients had contacted him.

90.     On information and belief, several clients Halpern developed at Capco have continued to contact him.

91.     I believe that there is a significant risk that these clients will follow Halpern to his next employer. Based on my experience in the industry, clients following an executive, particularly one of Halpern's stature, to a new employer is quite common.

92.     One of the reasons that Capco enters into BPAs is to protect its goodwill by preventing executives from going to work for competitors in competitive roles for a period of time so that Capco can secure the pre-existing client relationship.

93.     Given Halpern's indication that he does not intend to comply with the BPA, Capco instructed its attorneys to send a letter to Halpern, which they sent on August 5, 2022, outlining Capco's concerns and demanding certain assurances consistent with the BPA's restrictions, which Halpern to date, has refused to provide Capco.  A copy of this letter is attached hereto as Exhibit K.

## X.     Isaac Halpern's Anticipated Role at EYP

94.     Based on my over 30 years of experience in the financial services industry, including as a strategy consultant myself, I am familiar with the type of services EYP provides.

95.     EYP is EY's management consulting arm.

96.     On its website, EYP describes its business as helping "CEOs and business leaders design and deliver transformative strategies across the entire enterprise, to help build long-term value to all stakeholders."  A true and correct copy of the front page of EYP's website as of August 31, 2022 is attached hereto as Exhibit L.

WEIL:\98789107\8\33615.0008

97.     Like Capco, EYP has a Strategy group that provides the same type of services that Capco provides.

98.     Capco routinely identifies its competitors for purposes of strategy and internal analysis.  EYP is included on these lists.

99.     As EYP is a direct competitor, Capco routinely competes directly against EYP for clients and projects, particularly with regard to strategy projects.

100.    While Capco may have fewer employees than EYP, one of its greatest strengths and highest profile practices, is its Strategy Practice consulting arm, which allows it to go head to head with EYP on strategy projects.

101.    I understand from Halpern that he will be entering EYP as a Principal and Partner and be a leader of its Strategy practice at starting on or before September 19, 2022.

102.    EYP uses the hire of a new Partner as a marketing opportunity.  The hiring is treated with great fanfare, and EYP issues a press release, which on information and belief it attempts to place in industry publications.  Two examples of press releases relating to an EYP hire is attached hereto as Exhibit M.

103.    Based on my knowledge of the industry and practices at EY generally, it is my understanding that every Principal and Partner is expected to generate revenue.  Indeed, it is the case across the management consulting industry that the expectation of revenue generation is a key distinguishing factor between individuals at the Principal and Partner level and those at lower grades within consulting firms.

104.    There is significant overlap of clients with whom Halpern worked at Capco, after capitalizing on Capco's goodwill, and those that he would necessarily be looking to attract as a Principal in EYP's Strategy team.  Indeed, he has openly acknowledged to me that he intends to

WEIL:\98789107\8\33615.0008

to solicit financial services clients for EYP. I further understand, however, that he will be part of the same EYP team before and after the expiration of the term of his restrictions under the BPA.

105.     Given the competitive nature of the business, EYP is, without question, already targeting many of the same clients as Capco. As a leader of the strategy team, Halpern would necessarily be involved in some respect, even if indirectly, with winning these clients for EYP.

106.     Having access to Capco's confidential information would be extremely desirable to EYP and give it an immense competitive advantage on the commercial battlefield.

107.     Capco's confidential information that would be of immense value to EYP includes, but is not limited to, Capco's: client list, key contacts at existing and prospective clients, pricing information, pipeline business, client development plans, self-identified strengths and weaknesses, and strategies for originating and delivering products. All of this information would help EYP craft a strategy that would allow it to compete unfairly with Capco.

*[Signature Page Follows]*

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 7 SEPTEMBER 2022

_____

Michael Ethelston

WEIL:\98789107\8\33615.0008